E. Allen Reeves, Inc. v. Michael Graves & Associates, Inc.
3:10-cv-01393-MAS-TJB

Page **1** of **17**

# Final Pretrial Order

## Exhibit 3

5.   **DEFENDANT'S CONTESTED FACTS** (State separately for each defendant. See instructions above).

A. <u>Defendant intends to prove the following contested facts with regard to liability</u>.

1. The A/E contract documents (architectural, structural engineering and MEP engineering) fully and completely defined and delineated the architectural, structural, mechanical, electrical and plumbing ("MEP") designs for the Project.

2. The MGA A/E contract documents met the standard of care.

3. MGA's architectural documents complied with architectural professional standards and MGA met the standard of care.

4. Chou's structural engineering documents complied with structural engineering professional standards and Chou met the engineering standard of care.

5. K & G's Mechanical, Electrical, Plumbing, Fire Protection and HVAC Systems (MEP) documents complied with MEP engineering professional standards and K & G met the standard of care.

6. MGA did not deviate from the standard of care and did not cause or contribute to the delay of the project.

7. MGA complied with the New Jersey Rehabilitation Subcode.

8. NJDCA deemed the Project to be code compliant.

9. Reeves is a regional general contractor, limited to the Mid-Atlantic Region (Pennsylvania, New Jersey, Delaware and Maryland).

10. Reeves represents on its website that for 90 years, "it has been dedicated to attracting, training, and developing a highly skilled, efficient and effective carpentry force whose attention to detail and trade mastery sets the bar for our industry".

11. Further, Reeves represents on its website that its workforce is "a motivated field force ensures we are able to consistently meet our commitments to schedule,

       quality and client expectation". And that it has "long term relationships with subcontractors and suppliers throughout the region".

12. The ACP and Reeves contract was modified from the proposed contract. These modifications significantly altered the relationships among the Owner (ACP), Architect (MGA), and Contractor (Reeves).

13. ACP cannot unilaterally modify its contract with MGA, without MGA's expressed consent.

14. The modifications in the ACP and Reeves contract revised the performance standards for Reeves and its subcontractors; removed coordination drawings; gave Reeves unilateral decision-making authority over certain costs; and removed standard controls on contractor performance and cost containment; and contradicted the terms of the Owner-Architect Agreement.

15. The changes to the ACP and Reeves contract "restricted, modified or extended" MGA's authority, duties and responsibilities contrary to its obligations under document AIA 201.

16. MGA objected to the ACP and Reeves contract modifications. MGA did not agree to any modifications that materially altered MGA's contract with ACP.

17. The modification to the ACP and Reeves contract are no binding on MGA

18. Under the terms of the contract, Reeves was required to reasonably submit a schedule of submittals, arranged in chronological order by dates required by construction schedule. This is required to include time required for review, resubmittal, ordering, manufacturing, fabrication, and delivery when establishing dates. Reeves was also required to include the scheduled date for Architect's final release or approval. Reeves did not comply with this requirement. All submittal were required to be in writing and submitted to MGA.

19. Shop drawings are not contract documents. They represent the contractor's intentions for implementing the requirements of the contract documents. MGA review them only for the limited purposes stated.

20. Under the terms of the contract, Reeves was required to take field measurements of any existing conditions related to the project and shall observe any condition at the site affecting it.

21. Sal Arnone was the Co-Chair, Trustee Building Committee of ACP, during the construction of the project.

22. Arnone was the Director of Construction for the ACP for the Project.

23. Arnone was engaged by ACP and billed ACP through Tomis Consultants (a sole proprietorship owned by Arnone) to act on its behalf as the Director of Construction on the Project.

24. Sal Arnone had the contractual obligation to the ACP to review Contractors performance, as it applies to Safety and attend safety meetings.

25. Sal Arnone had the contractual obligation to the ACP to represent the Arts Council in dealing with Government agencies RE: Construction issues.

26. Sal Arnone had the contractual obligation to the ACP to monitor Contractors progress and adherence to completion schedule.

27. During the course of the Project, some of the normal duties and responsibilities of MGA were taken over by Arnone, thereby bypassing MGA. This action removed some of the checks and balances that normally protect the Owner from unjustified excess costs, schedule delays and deficiencies in the work.

28. MGA did not fail to perform its administrative duties in conformance with professional standards.

29. Arnone was aware that removing MGA's administrative duties would create risk to the ACP, delay the project and increase the costs to ACP. Arnone assumed those risks on behalf of ACP.

30. Arnone disrupted the normal communication between MGA and Reeves.

31. Arnone was referred to as a misogynist by Peter Bienstcok due to his treatment of Diana Nelson.

32. Reeves was aware that removal of the checks and balances that normally protect the Owner from the contractors unjustified excess costs, schedule delays and deficiencies in the work would disadvantage ACP to Reeves advantage.

33. MGA had no contractual obligation to perform a destructive testing survey of the existing building.

34. MGA was not requested to perform an existing conditions survey.

35. MGA had no contractual obligation to perform an existing conditions survey.

36. A detailed roof condition survey was not part of the MGA scope of service.

37. MGA had no contractual obligation to perform a roof condition survey.

38. The contract between the ACP and MGA required the ACP to provide full information of the existing conditions of the project to MGA. ACP failed to fully inform MGA of its knowledge of the existing conditions.

39. MGA was provided with the original 1939 drawings. These drawings contained no structural information about the framing of the existing building.

40. The existing structure contained numerous concealed conditions and hidden field conditions.

41. Under the terms of the contract, ACP had the financial obligation for concealed or hidden conditions.

42. During the design phase and value engineering phase, ACP requested MGA to reuse, as much as possible, the existing infrastructure, such as windows and flooring.

43. During the construction phase of the project, ACP directed numerous owner directed changes. The decisions and directions of the ACP owner requested changed the scope of the project. These changes are not the liability of MGA. MGA is not liable for the costs of owner requested changes and any the additional time or delay incurred on the project.

44. The contract between ACP and MGA required the ACP to furnish surveying services, upon the request of MGA. The ACP retained Van Note Harvey Associates, PC as its surveying consultant. Van Note Harvey performed the base mapping of existing conditions of the existing building, which included the elevations of the building. MGA relied upon the surveying information performed by Van Note Harvey, and incorporated the provided information in the A/E contract documents. MGA is not liable for any errors in Van Note Harvey's work.

45. Reeves retained Van Note Harvey to provide the survey services required for the construction of the Project.

46. The contract between ACP and MGA required the ACP to provide environmental testing service, upon the request of MGA. ACP retained an environmental testing consultant, who performed asbestos testing. After the abatement efforts by ACP, to the best of MGA's knowledge no additional asbestos remediation was required.

47. Reeves did not sequence the work of its subcontractors.

48. Reeves had a contractual obligation to coordinate the work of its subcontractors.

49. Reeves had a contractual obligation to provide coordination drawings. This obligation was reduce by Arnone. Reeves failed to adequately coordinate the project by its failure to require an adequate number of trade coordination drawings.

50. Coordination drawings are a critical element in the construction process and the proper sequencing and distribution is required for an accurate completion of the contractor coordination drawings.

51. The lack of Reeves coordination drawings created numerous field conflicts and field coordination delays and delayed the project.

52. Under the terms of its contract, Reeves was responsible for all lines and elevations necessary for the construction of the work; and was responsible for the layouts. Reeves did not verify the field conditions of all the dimensions shown on the A/E contract documents prior to installation work in the field.

53. Reeves did not perform the required field verification of the elevations, prior to the installation of the structural steel.

54. Van Note-Harvey Associates performed an as-built survey of the 1) existing finished basement, 2) addition finished basement, 3) addition finished basement depressed area, 4) addition first floor, and 5) addition top of wall. Van Note Harvey verified that Reeves constructed portions of the addition at the wrong elevations.

55. MGA has no liability for Reeves failure to correctly perform the required measurements prior to its construction of the project.

56. Reeves was provided copies of all revised A/E contract documents. These were provided to Reeves, which is sufficient authority for Reeves to proceed with the work.

57. Receipt of the approved A/E contract documents from NJDCA did not preclude Reeves from constructing the Project as directed in the revised A/E contract documents or CSKs.

58. Reeves was required to follow the contract specifications.

59. Reeves was obligated to submit its submittals in conformance with the contract.

60. Reeves did not correctly bid the project.

61. The issuance of A/E contract documents did not delay the project.

62. The ACP owners requested changes to the scope of the project required the issuance of revised A/E contract documents.

63. MGA and Chou rejected the Dobslaw structural steel submissions.

64. The revisions to the A/E contract documents made no revisions that would have delayed the resubmission of the shop drawings.

65. Reeves delayed the project in its management of the resubmission of rejected shop drawings.

66. Reeves delayed the return of the structural steel shop drawings, due to Reeves' failure to adhere to the contract requirements regarding its obligation to provide a schedule of submittals.

67. Reeves delayed the installation of the structural steel.

68. MGA and Chou rejected resubmission of structural steel shop drawings due to the errors contained in the shop drawings.

69. MGA returned the required responses to the Reeves submission in conformance with contract.

70. Reeves did not resubmit the second submission of the rejected Structural Steel Shop Drawings in a timely manner.

71. Reeves submitted no Request for Information on the behalf of Dobslaw that were related to the structural steel required for the addition.

72. Dobslaw made no requests directly to MGA or Chou for assistance in providing missing information contained within the A/E contract documents. The A/E contract documents contained all of the required information for Dobslaw to sufficiently detail the structural steel shop drawings.

73. During the course of the project, Arnone was unaware of the importance of the structural steel contract's requirement to retain a Professional Engineer (PE) to sign and seal the structural steel shop drawings.

E. Allen Reeves, Inc. v. Michael Graves & Associates, Inc.
3:10-cv-01393-MAS-TJB

Page **7** of **17**

74. During the course of the project Reeves was aware of the importance of the structural steel contract's requirement to retain a Professional Engineer (PE) to sign and seal the structural steel shop drawings.

75. Dobslaw did not retain the required Professional Engineer (PE) to design the required connection details.

76. Dobslaw did not retain the required Professional Engineer (PE) to sign and seal the structural steel shop drawings.

77. Reeves and Arnone were aware that Dobslaw did not retain the required Professional Engineer (PE).

78. Dobslaw did not submit the required erection plan for review by MGA and Chou.

79. Dobslaw made numerous commitments to Reeves that it would submit the corrected shop drawings to Reeves.  Dobslaw delays in submitting the require revised structural steel shop drawing were unrelated to any revisions in the A/E contract documents.

80. Dobslaw misrepresented to Reeves the amount of work related to the structural steel shop drawing revisions resulting from the revision to the A/E contract documents. Dobslaw submitted the change order in an effort to recoup his time for correcting his own rejected detail work on the structural steel shop drawings.

81. Cho hand wrote on the rejected structural steel shop drawings on the required revisions, including those that were the result of the revisions of the A/E contract documents. Dobslaw had all the information he required.

82. Dobslaw's change orders for extra work were rejected by Reeves. Dobslaw never provided the requested backup for the change orders.

83. Reeves asked Dobslaw to perform extra work, which was unrelated to any revisions to the A/E contract documents.

84. Reeves informed Dobslaw on numerous occasions that Dobslaw was delaying the project.

85. Dobslaw completed the required corrections to structural steel shop drawings in August 2006, but only submitted the Anchor Bolts Shop Drawing - Submission No. 2 and Structural Steel Shop Drawings (Basement) - Submission No. 2 to MGA.

86. MGA and Chou rejected the Structural Steel Shop Drawings (Basement) - Submission No. 2.

87. MGA requested that the corrected structural steel shop drawings be resubmitted for review.

88. Reeves directed Dobslaw to fabricate the required structural steel for the basement, first floor and second floor, without approved shop drawings.

89. Arnone had knowledge that Dobslaw had fabricated the required structural steel for the basement, first floor and second floor, without approved shop drawings.

90. Dobslaw completed the fabrication of the basement, first floor and second floor structural steel without approved shop drawings.

91. Dobslaw's delays in erecting the structural steel were unrelated to any revisions in the A/E contract documents.

92. Reeves directed Dobslaw to install the structural steel.

93. On October 30, 2006, Dobslaw began installing the structural steel in the addition.

94. Dobslaw installed the structural steel incorrectly.

95. Reeves had knowledge that Dobslaw installed the structural steel without approved shop drawings, as it gave Dobslaw the direction to do so.

96. Arnone had knowledge of Reeves direction to Dobslaw to install the structural steel without approved shop drawings. Sal Arnone approved Reeves direction.

97. Reeves and Arnone were aware of the risks to ACP by permitting Dobslaw to fabricate structural steel without approved shop drawings. Reeves and Arnone disregarded the risks and accepted the liability.

98. Reeves and Arnone were aware of the risks to ACP by permitting Dobslaw to install structural steel without approved erection drawings. Reeves and Arnone disregarded the risks and accepted the liability...

99. Reeves Arnone were aware of the risks to ACP by permitting Dobslaw to install structural steel without approved shop drawings. Reeves and Arnone disregarded the risks and accepted the liability.

100. Sal Arnone was aware of the true reasons for the delays in the installation of the structural steel and intentionally misrepresented to the ACP Board that it was due to the A/E contract documents.

101. Arnone did not inform the ACP Board of his authorizations regarding the fabrication and installation of the structural steel without approved structural steel shop drawings.

102. After the insulation of the structural steel, Reeves requested Dobslaw to complete the required structural steel shop drawings.

103. Dobslaw was aware of the risks to ACP by fabricating structural steel without approved shop drawings. Dobslaw disregarded the risks and accepted the liability.

104. Dobslaw was aware of the risks to ACP by installing structural steel without approved erection drawings.  Dobslaw disregarded the risks and accepted the liability.

105. Dobslaw was aware of the risks to ACP by installing structural steel without approved shop drawings.  Dobslaw disregarded the risks and accepted the liability.

106. Dobslaw was aware that it fabricated structural steel in a manner inconsistent with the A/E contract documents.

107. Dobslaw was aware that it installed the structural steel in a manner inconsistent with the A/E contract documents.

108. Dobslaw was aware that it installed the structural steel in a manner that it would not close.

109. Dobslaw made numerous fabrication and installation errors in the erecting of the structural steel.

110. Mr Randy Dobslaw's illness affected his ability to perform on the ACP project.

111. Dobslaw lacked the necessary motivation to perform as the structural steel contractor. Dobslaw did not return phone calls to Reeves, failed to communicate with Reeves, missed scheduled appointments, failed to timely retain a qualified steel erector, failed to resubmit the required shop drawings, fabricated steel without approved shop drawings, installed steel incorrectly and in the wrong location.

112. Dobslaw lacked the necessary skills to produce the required shop drawings.

113. Dobslaw lacked the necessary skills to correctly fabricate the required steel.

114. Dobslaw lacked the necessary skills to correctly erect the required steel.

115. Reeves and Arnone failed to adequately supervise Dobslaw.

116. Dobslaw was delaying another Reeves project, being constructed during the same period as the ACP project.

117. On December 11, 2006, Reeves terminated Dobslaws contract for failure to abide by the terms and conditions of the contract.

118. After its termination, Dobslaw continued working as the structural steel contractor for Reeves.

119. Dobslaw was terminated too late in the construction process. Dobslaw delayed the project.

120. Reeves informed Dobslaw that Dobslaw's failure to perform caused significant delays.

121. The Project Specifications required the receipt of approved Structural Steel Shop Drawings before fabrication and installation of structural steel.

122. Industry practice requires the receipt of approved Structural Steel Shop Drawings before fabrication and installation of structural steel.

123. The Project Specifications required Reeves to verify all field dimensions prior to fabrication and erection of the structural steel.

124. The basement steel was fabricated and installed without approved shop drawings.

125. The first floor steel was fabricated and installed without approved shop drawings.

126. The second floor steel was fabricated and installed without approved shop drawings.

127. Reeves and Arnone were aware that Dobslaw fabricated structural steel in a manner inconsistent with the A/E contract documents.

128. Reeves and Arnone were aware that Dobslaw installed the structural steel in a manner inconsistent with the A/E contract documents.

129. Reeves and Arnone were was aware that Dobslaw installed the structural steel in a manner that it would not close.

130. Arnone did not inform the ACP Board of his knowledge of how Dobslaw installed the structural steel and intentionally misrepresented that it was the fault of the A/E contract documents.

131. After Dobslaws termination, Dobslaw continued to delay the erection of the structural steel.

132. After the termination, Dobslaw withheld fabricated structural steel from Reeves.

133. Reeves delayed the fabrication and installation of the remaining structural steel while it negotiated with Dobslaw.

134. Reeves did not retain a single subcontractor to replace Dobslaw, it retained two. Neither of the these two contractors had sole responsibility for the fabrication and installation of the structure steel.  Reeves became its own steel contractor, coordinating the work of the fabricator and installer.

135. Reeves retained Dobslaw's steel erector, H & R Welding (H & R).

136. Reeves retained Architectural Steel & Associated Products (AS) as the steel fabricator.

137. Reeves delayed the project by not replacing Dobslaw in a timely manner. And further delayed the project by not retaining replace steel contractors in a timely manner.

138. The first floor structural steel installed by Dobslaw did not close. This was the result of fabrication and/or layout errors by Dobslaw and/or Reeves.

139. The structural steel designed by Chou closed.  The failure of the steel to close was the result of a field condition, as installed by Dobslaw, and not the result of any design defect by either MGA or Chou.

140. MGA did not delay the project steel fabrication or erection.

141. The responsibility for delays arising from the installation of steel lies solely with the Reeves.

142. H & R made required repairs to Dobslaw's fabrication and installation issues. H & R and Reeves needed to re-fabricate in the field much of the installed steel.

143. Reeves provided AS with copies of the A/E contract documents and Dobslaw's shop drawings on January 23, 2007. The balance of the structural steel could not be fabricated or installed during this time. As refused to use Dobslaws shop drawings.

144. Reeves failed to provide AS with the current revisions to the A/E Contract documents, nor did it explain the importance of the structural steel to the completion of the project.

145. Reeves provide incorrect and conflicting information related to the as-built conditions of the structural steel. The building dimension (structural steel) did not close.

146. AS encounter field-related problems, where the field conditions did not match the design drawings. The structural steel portion of the A/E contract documents closed, but the installed steel did not match the structural drawings.

147. The structural steel installed by Dobslaw and corrected by H & R deviated from the A/E contract documents.

148. H&R installed second floor steel. The steel was a combination of steel removed from the site that was re-fabricated (the steel fabrication by AS was a re-fabrications of defective pieces previously fabricated by Dobslaw) and newly fabricated steel.

149. Reeves did not submit any AS shop drawings for the second floor steel.

150. On April 23, 2007, the last piece of second floor steel was installed and the second floor deemed complete.

151. Reeves did not release AS to begin detailing the second floor steel structural steel shop drawings until April 17, 2007. Reeves did not request any assistance from MGA in resolving the installed steel issues.

152. Reeves apparently did not learn from its prior mistake, and for the second time on the project allowed structural steel to be installed without approved shop drawings.

153. As with Dobslaw, Reeves and Arnone were aware of the risks to ACP by permitting to AS to fabricate and install structural steel without approved shop drawings. Reeves and Arnone disregarded the risks and accepted the liability.

154. The Contract Documents required the signing and sealing of the steel shop drawings by a Professional Engineer (PE) employed by the steel contractor.

155. The requirement for certified steel erection shop drawings signed and sealed by a Professional Engineer (PE) employed by the steel contractor was reinstated into the ACP and Reeves contract.

156. Reeves' Price Request No. 1 restored the requirement for certified steel erection shop drawings signed and sealed by a Professional Engineer (PE) employed by the steel contractor. Reeves was paid for this price request.

157. Dobslaw did not retain or use the services of Professional Engineer (PE). Dobslaw submitted the structural steel shop drawings without being signed and sealed by a Professional Engineer (PE).

158. AS did not retain or use the services of Professional Engineer (PE). AS submitted, the structural steel shop drawings without being signed and sealed by a Professional Engineer (PE).

159. Reeves Price Request 23R contains a credit of $10,356 for the "work not performed to provide Structural Engineer's review & seal for steel shop drawings." Reeves gave ACP a credit for the value of Price Request 1, as it did not retain the Professional Engineer, as required by contract.

160. Reeves disputed the validity of Dobslaw's change orders and requested backup

161. Reeves did not direct AS to retain a Professional Engineer (PE) and provide no requirement in the Reeves and AS contract that it do so.

162. AS lacked the skills necessary to produce shop drawings on its own without significant help from Chou.

163. During the project, Chou, when requests by AS, provided the engineering service, required to be provided by the steel contractor retained Professional Engineer (PE).

164. The RFIs submitted by AS were requesting assistance in designing the connections in preparation of the structural steel shop drawings, as AS had not retained the required Professional Engineer (PE). MGA did not receive the majority of the AS RFIs.

165. Reeves amended its construction schedule to compensate for it errors in its logic. The amendment added new critical events, which previously had no

      allocated time and extended the time for the construction activities. Additionally, the schedule left off activities that were on the critical path.

166. The exterior block wall was on the critical path for the structural steel. This caused a delay on the critical path.

167. Reeves placed on notice various subcontractors for substandard performance, these were the glazing, electrical, plumbing, and sprinkler contractors.

168. ACP was delayed in providing the Owner-furnished equipment items (appliances).

169. Reeves did not coordinate the work if its subcontractors or sequence it. Reeves allowed each contractor to set their own individual priorities, even if it negatively impacted the work of other trades. Reeves' Site Superintendent described it as a "free for all".

170. The ACP Capital Campaign Fund is continuing.

171. MGA made the recommendation that ACP retain a theater consultant prior to the completion of the A/E documents.

172. ACP retained a theater consultant during the middle of the construction project.

173. The theater consultant did not make corrections to errors or omissions to the A/E documents. Although his consultation to the owner did require the issuance of revised A/E contract documents. MGA is not liable for the ACP directed changes as ACP changed the scope of the project.

174. ACP retained a security consultant during the course of the project.

175. The security consultant did not make corrections to errors or omissions to the A/E documents. Although his consultation to the owner did require the issuance of revised A/E contract documents. MGA is not liable for the ACP directed changes.

176. Van Note Harvey was the surveying consultant retained directly by the ACP.

177. The ACP requested numerous changes to the scope of the project that contributed to the additional time required on the project.

178. PR 4 is not MGA's error. It was an owner requested change.

179. PR 5 is not MGA's error. It was an unforeseen field condition.

180. PR 7 is not MGA's error. It was an owner requested change.

181. PR 10 is not MGA's error. It was an owner requested change.

182. PR 11-R is not MGA's error. It was an unforeseen field condition.

183. PR 12R is not MGA's error. It was an unforeseen field condition.

184. PR 13 is not MGA's error. It was an unforeseen field condition.

185. PR 17 is not MGA's error. It was an unforeseen field condition.

186. PR 194R is not the result of an MGA error. These were unforeseen field condition and error made by Reeves.

187. PR 20 is an error made by Reeves, owner requested change and MGA error. (should be split equally).

188. PR 23 is not MGA's error. It was an owner requested change.

189. PR 24R is not MGA's error. It was an error made by Reeves.

190. PR 31R is not MGA's error. It was an unforeseen field condition owner requested change.

191. PR 32R2 is not MGA's error. It was an owner requested change.

192. PR 35 It was an error made by Reeves and MGA. (Should be split equally).

193. PR 36 is not MGA's error.  It was an error made by Reeves.

194. PR 38 is an error made by Reeves, owner requested change and MGA error. (should be split equally).

195. PR 39 is not MGA's error. It was an error made by Reeves.

196. PR 42 is not MGA's error. It was an unforeseen field condition.

197. PR 43 is not MGA's error. It was an owner requested change.

198. PR 50 is not MGA's error. It was an error made by Reeves.

199. PR 57 is not MGA's error. It was an owner requested change.

200. PR 58 is not MGA's error. It was an error made by Reeves.

201. PR 59 is not MGA's error. It was an owner requested change.

202. PR 60 is not MGA's error. It was an error made by Reeves.

203. PR 62 is not MGA's error. It was an unforeseen field condition.

204. PR 65 is not MGA's error. It was an owner requested change.

205. PR 69 is not MGA's error. It was an error made by Reeves.

206. PR 71 is not MGA's error. It was an error made by Reeves.

207. PR 74 is not MGA's error. It was an owner requested change.

208. PR 78 is not MGA's error. It was an owner requested change.

209. PR 80 is not MGA's error. It was an owner requested change.

210. PR 83 is not MGA's error. It was an owner requested change.

211. PR 87 is not MGA's error. It was an owner requested change.

212. PR 91 is not MGA's error. It was an owner requested change.

213. PR 99 is not MGA's error. It was an error made by Reeves.

214. PR 97 is not MGA's error. It was an owner requested change.

215. PR 101 is not MGA's error. It was an owner requested change.

216. PR 102 is not MGA's error. It was an owner requested change.

217. PR 107 is not MGA's error. It was an error made by Reeves.

218. PR 114 is not MGA's error. It was an owner requested change.

219. PR 115 is not MGA's error. It was an error made by Reeves.

220. PR 117 is not MGA's error. It was an owner requested change.

221. PR 118 is not MGA's error. It was an error made by Reeves.

E. Allen Reeves, Inc. v. Michael Graves & Associates, Inc.
3:10-cv-01393-MAS-TJB

Page **17** of **17**

222. PR 122 is an error made by Reeves, owner requested change and MGA error. (should be split equally).

223. PR 141 is not MGA's error. It was an unforeseen field condition.

224. The verification of "existing conditions" dimensions exposed during the course of construction to connect to an existing building is not the responsibility of MGA.

225. Reeves lack of field coordination, contractor coordination drawings and proper sequencing of the work caused the project delays

226. The MEP portion of the A/E contract documents caused no delay to the project.

227. The ACP directed changes delayed the project.